19-2820, Mr. Beck, and Ms. Pollack. Good afternoon, Your Honors, and Ms. Pollack. May I please report? I'm sorry. Sorry about that. I jumped right in. I thought you were referring me to get on here. We've got it backwards. I apologize. Okay, go ahead. You go right ahead. I'm sorry. Sounds good. Good afternoon, Your Honors. Ms. Pollack, may it please the Court. Daniel Beck on behalf of the appellants, Pennsylvania State Corporals Felsman and Nyland. I'd like to reserve three minutes for rebuttal time. You sure can. Thank you. The appellants respectfully request that this Court reverse the District Court's Rule 56 Summary Judgment Ruling and or Rule 50 or 59 motions with respect to Corporal Nyland's inventory search of Appellee's vehicle prior to it being towed on the afternoon of May 11, 2016, and Corporal Felsman's May 12, 2016, courtesy transport of the appellee from the Magistrate's office to the impound lot with restraints. Although chronologically out of order, I plan to address the courtesy transport first and then the inventory search. With respect to the courtesy transport, given that no claim related to this specific occurrence was ever pled, discovery on the issue consisted of a total of about four lines of deposition testimony, and it was not specifically mentioned in the appellee's motion for summary judgment. Corporal Felsman was never placed on notice of the claim until the reply brief in support of the motion for summary judgment. And this Court should reverse the District Court's ruling, granting judgment to the appellee on this unreasonable search claim as it was... Could argue if you may that his arrest or his custodial status was really a continuum that went from the jail until he was taken back to his car without a break in circumstances? I think there's a break in circumstance in respect to the release. If you look at it that way, then certainly the maintaining of the restraints would be reasonable based on the initial commitment order. But the way the Court construed it was to separate them and find that the commitment order changed the analysis, essentially separated the occurrences into completely separate and discrete incidents with completely separate legal analysis regarding the justification for the seizures. So on one hand, if it was continual, the justification would continue. But the Court construed them differently, finding that they were completely different in that upon when leaving the jail, the commitment order initially upon leaving jail and going to the magistrate's office, the commitment order was the legal justification required for the restraints. The Court then went on to say that there was no legal justification for the use of the restraints from the magistrate's office to the impound lot because the commitment order was no longer in place. I think that makes the events separate and discrete. So under Rule 8, given that there was the factual allegation in Paragraph 18 of the Third Amendment complaint only stated that he was seized and handcuffed upon leaving jail, not upon leaving the magistrate's office, and that occurrence, believing the jail, was justified by the commitment order, to have a claim related to that separate incident, i.e. the leaving the magistrate's office and going to the impound lot, required a separate pleading, at least stating some facts related to that latter occurrence to put the appellants on notice that the issue was in play in order to satisfy the requirement under Rule 8 that they state a plausible claim for relief. I think the appellants were correct when they argued in their own summary judgment motion that this was a separate occurrence, that it wasn't addressed because it was never pled, and that the complaint failed to state a claim for relief. The pleading deficiency was actually identified by the District Court in its memorandum opinion where the Court noted at Appendix 0024 that Whatley essentially alleged that he was handcuffed and shackled upon leaving jail, and that the defendants argued that it should be interpreted, that pleading should be interpreted to relate only to when the appellant left the jail and was still under the commitment order. So I think it's the logical assumptions based on that, and the arguments in the summary judgment motions were focused on that. In contrast, the Court noted that Appelli appears to have meant this statement to allege that he was handcuffed while being transported from the magistrate's office to the impound lot after his release. Now, this sort of ambiguity, typically in any other situation, would be construed against the drafter of the complaint as he's the master of the plaintiff's master of his own complaint. It certainly didn't meet the pleading standards under Igbal and Twombly that require that the complaint must state sufficient facts from which a claim can be determined to be plausible on its face. Let me go back to essentially the problem that I see is the May 12 transport from the magistrate's office to Whatley's car in the impound lot, and you contend that the magistrate ordered your clients to drive Whatley to the lot, and that your clients specifically informed Whatley he would be handcuffed and shackled, and that Whatley implicitly consented. And that may be true, but if it is true, why didn't you argue that in the district court in your answer to the complaint or the opposition to summary judgment? Well, because it wasn't argued in the district court, and it wasn't argued in response to the complaint because it wasn't clearly alleged in the complaint. What was alleged in the complaint was that he was handcuffed leaving jail. And when he left jail, there's no dispute that he was still under the commitment order and that was legally justified. So it wasn't before the court and wasn't even raised until the appellee's plaintiff's reply in support of his motion for summary judgment. That was the first time that claim was specifically articulated to include the magistrate's office. And even if it was properly pled, the case certainly wasn't right for summary judgment because there was really no factual development related to the claim. It's well-established that the standard for summary judgment is that there's no material fact in dispute. And based on the undisputed facts, one party is entitled to judgment as a matter of law. The facts are required to be judged in the light most favorable to the opposing party. In this case, it's less than Mr. Becker's inventory search. The argument, as I understand it, from your side, is that because the jury found the other officer that searched the passenger side of the truck, I believe the name was Soane. That's correct. Because the jury exonerated Soane, it had to have an irrational or unsustainable verdict that they hit Lila with a dollar because Lila could not have taken the $800 in the envelope because Mr. Watley testified that was on the passenger side of the vehicle, right? That's part of the argument, that the verdicts are inconsistent and that the verdict shows the reasonableness of the actions. Here's the question. Why isn't it possible that the jury found Nyland liable? Because the jury concluded not that Nyland failed to take custody or care of the $800, but rather Nyland instituted a general search rather than an inventory search. Based on the evidence that was presented at trial, certainly the decision for Trooper Stroh wasn't determinative, ultimately, of the decision with respect to Trooper Nyland. I think our argument is essentially that Officer Nyland's conduct was completely reasonable and consistent with the requirements for an inventory search. There was a difference between the two searches, right? Nyland searched the wheel well. Nyland searched the driver's side, same areas, and then back and searched the trunk. The other officer did not search the trunk. But it was more than just the trunk. It was a more specific search in the trunk, wasn't it? When he looked in the trunk, he looked it up. I think there's a spare tire and then the panel, and there was a bag in there that he looked it up and looked in. But those aren't places where valuables wouldn't necessarily be found. So in conducting an inventory search, the requirement is that they search in places where valuables are likely to be found. People often don't put their valuables on the top of their car. People often secrete those in places where you wouldn't normally look. And it wasn't like you did when you watched the video, and it's at the minute marker, 52 minutes. You can see that initially, you know, that the appellee was advised that under PA laws the vehicle was going to be towed and that prior to it being towed it was going to be inventory searched for valuables. And they asked him if at all he wanted to identify any valuables. He didn't. Then they continued to conduct the inventory search, and they searched all the places where you would expect to find valuables. Certainly there's no case law that would establish at this point that the search that they conducted was so outside the normal guides of the inventory search that they wouldn't be subject or wouldn't be entitled to qualified immunity for the search that they conducted because it was the same areas where you would likely see valuables. It was conducted pursuant to standardized protocols. What evidence is there on the record to establish what the Pennsylvania Police's standardized protocols are for inventory searches? There's the testimony of the officers that explained that they've conducted multiple inventory searches and that this was how they conducted their searches and ultimately that they would not fill out an inventory log unless valuables were recovered. Even when you look at the video, when they recovered the one valuable that was discovered, the phone was handed over to the plaintiff's appellate for safekeeping, and because they found no other valuables, they didn't complete the log. There's no requirement. One of the arguments that's made by the appellate is that because we didn't move the actual field regulation into evidence, that that somehow negates that it was a reasonable or legal inventory search, whereas the Franks case makes clear that the officer is not required to submit the actual regulation or policy, only that the testimony essentially established that they followed standardized criteria. And I think the evidence in the record based on the testimony of the two troopers, including Nylon, who conducted the inventory search, establishes, in fact, undisputedly that it was conducted pursuant to the policies of the PSP. And therefore, even if putting the inconsistent verdicts aside, based on the evidence that was presented, at the very least, even with the jury verdict, they'd be entitled to qualified immunity because there was no clearly established law that would have showed them that they were outside the guideposts for a normal inventory search. Going back to the courtesy transport, the collateral consequences of the decision ultimately spilled over into the excessive force claim. As this court is well aware, when a seizure is deemed unlawful, the force used is essentially assumed to be excessive. According to the ruling, essentially took the excessive force issue away from the jury as the verdict sheet was prefilled with a checkmark for an unlawful seize that Corporal Feldman unlawfully seized at Pele in May 12, 2016. So that furthered the prejudice to Corporal Feldman as it essentially mandated that the jury was going to be required to find excessive force. Any further questions, gentlemen? None on my end. Thank you, Your Honor. We'll get you back on rebuttal. How much time did you reserve for rebuttal, by the way? Three minutes. That's fine. No problem at all. Thank you so much, Your Honor. You're welcome. Mr. Beck? My turn would be Attorney Pollack. May it please the Court, Cynthia Pollack. I'm sorry. I'm totally screwed up. My fault. That's okay. It is. Okay. The problem is me. You represented the appellee, right? Yes, I did. Okay. My fault. Okay. You represented Mr. Watley. Okay. No problem. Your Honor, I would have you look at Document Entry 88, which is the proposed jury questionnaire for the jury, which the defendants actually conceded that Corporal Feldman unlawfully seized Mr. Watley on May 12, 2016. So they asserted that fact to the Court on 10-10-2018, and then after plaintiffs rested his case on 10-15-2018, the defendants moved to reverse that court within five days. So clearly they should have moved forward related to the fact that the Court had found some judgment in favor of Mr. Watley. On what ground would Feldman have been on notice, Judge Ambrose, that you were challenging as unlawful anything related to the May 12 ride to the impound lot? That doesn't seem that that was – I don't see that alleged in the complaint. Your Honor, I would say that we specifically said handcuffed. We put in the complaint, as well as our statements of facts, undisputed handcuffs yet had been released from jail, which is a continuum. There was testimony not only that I noted in my appellee brief, but also in the record that I'll refer the Court to Appendix 0769, counsel for the defendants, Attorney Granata, stated the question she posed was that sometimes did a trooper or troopers pick you up from the prison the following day on May 12. Watley's response was somebody picked me up in the morning. It could have been Trooper Feldman again. I think it was. I can't 100% say so, but I think it was because I remember that day going with some troopers. But it looks as if – I'm just looking – he pled that on May 12, 2016, plaintiff was unlawfully searched and seized by a defendant, Feldman, when he handcuffed and shackled Feldman upon leaving the jail, whatever that means. But that only put Feldman on notice that Watley was challenging as an unreasonable seizure the first ride from the jail to the magistrate's office, not the second ride from the magistrate's office to the impound lot. That's the way I'm reading it. Well, I would disagree with you, Honor, only because of the fact that Mr. Watley specifically told during his deposition to the lawyers on the other side that he specifically on Appendix 762, he says to do all what he did the whole entire 24-hour period or almost 24-hour period was a complete traumatizing experience. It also, to the point that it's a terrorizing experience, sustained over a 24-hour period. When he was released from prison, they had a release of prisoner, which defendant Feldman did not acknowledge that it actually exists. It looks to me only that the first time that this was raised, that is from the magistrate's office to the impound lot, was in the reply to the motion for summary judgment. And I would disagree, Your Honor, because... Tell me where it's before that, then. I'm not finding it. Okay, the Statement of Facts and Number 19, which defendant admitted that Feldman did handcuff him, yet he had been released from jail. So they would want us to close that little gap and say only one part of it. I would argue that it's a continuum, and that if you go to Appendix 553, they admit that he was handcuffed, and he was handcuffed, shackled, and his handcuffs actually had a loop belt. Upon leaving the jail, when you look at JA 532. Upon leaving the jail, they never took the handcuffs off, and again, it was a belt. So they admitted during trial testimony, but in all reality, the fact that defendants never raised the proper mechanism that they want judgment but not a new trial, the evidence in the records clearly supported the judge's determination that the handcuffing to the impound lot, which started after being released from jail and never stopped being present, did cause an unlawful seizure to occur, and again, they admitted it in their proposed instructions, and so therefore, it wasn't the case. They had notice, and in fact... You want to run that by me again, where they admitted it? They admitted... Oh, I'm sorry, Your Honor. Go ahead. The appendix 553, I had a statement of, you know, undisputed facts. They answered number 19, admitted, and it was handcuffed, yet had been released from jail. When he was released from jail, he was released. I had plaintiff's concipit 9 that defendant Feldman did not acknowledge, but it had a 1034 a.m. time version of it, which is consistent with Watley's version of what occurred because he did not get back to Connecticut until after 4 p.m. that same day. So we presented sufficient notice, and in fact, opposing counsel during the deposition of Feldman specifically had asked Mr. Watley about that question. She said, question, after you're released from jail and obtaining your vehicle from impound, did you go straight back to Connecticut? Yes. And then prior to that, the lawyer for the defendant said, Mr. Watley, I didn't talk to you about obtaining your car from the vehicle impound lot. What process was required for you to get your car back? Answer, I had to pay a tow and storage fee. And then question, do you recall how much that amounted to? Answer, you know, I forgot. I believe it's in the glove box of the car still in front of my sister's business. I'll have to go there and send it to Attorney Pollack. And that's Appendix 774. So clearly, not only defendant Feldman's deposition transcript and the admission to the statement of fact, but also Watley's own deposition transcript showed that they did cover that area related to the entire transport of the plaintiff, which clearly he had never been even uncuffed in court. So clearly, not him being in that state and stating about 24 hours, clearly there was evidence and they were put on notice of the fact that that was the claim, at least 24 hours, because of the fact you can't parcel it out, because of the fact that he stayed in the same logistic position, a lap belt, handcuffs through, and then shackled. So clearly, someone isn't freely able to leave when you're shackled, and they admit that. Let me ask you this. Was it a condition of his ride? In other words, he was offered a ride, and in exchange for that ride, he had to agree to be shackled. Is that right? Because it was department policy. No. Number one, in the summary judgment, to me, it's already gone because of the fact once you go to trial, it's what happens at trial. So they worked too little too late raising it at trial after plaintiff's arrest. Number one, the release of prisoner form specifically had 1034 that he was released, and when he was released, that's when he was handcuffed, shackled, and then the lap belt was placed around him. And at that point, from the rest of the remainder that he was with the defendants, he was in that posture, and they admit that it was problems with his motion, his restricted range of motion, Appendix 170, 23 to 25, and the belt with the loop that handcuffs go through limits hands and arms, and that would be Appendix 210, 620. So clearly there was sufficient evidence that was developed that they should have known that they shouldn't do that. And secondly, in the summary judgment record, they never placed any type of, you know, courtesy trip or anything. There was no exhibits. There was only two deposition transcripts and a transcript from a summary appeal hearing since Whatley was cleared from all of these charges. So they did not assert what they should have asserted at the time of summary judgment. So the court was well within its realm to make a determination that because you didn't defend this, and they didn't even assert qualified immunity in response to plaintiff's brief and support, then 14 days occurred when the reply brief was submitted by plaintiff, and then they filed their own motion for summary judgment. And they, again, do not address the handcuffing, the shackling, the belt loop, but it was a continuous time. So, again, they waived any right because clearly they even admit in their opening brief that there's material facts that they believe at the time of trial were indisputable. At the time that summary judgment was decided, there was no dispute because each, you know, they were cross motions, so the judge had all the evidence there, and he made the correct decision in finding that Whatley was seized, and his movement was restricted and it wasn't a courtesy. Ms. Pollard, let me ask you a question about the legal standard. I have a concern that the district judge may have applied the wrong legal standard. In his opinion at page 17, which is the appendix at 29, this is the judge's ruling on the qualified immunity issue, the question of clearly established law. I'm looking at the top of that if you have it handy. The judge wrote, at bottom, no case stands for the proposition that a police officer may handcuff an individual who has been released from custody and who poses no threat to the officer's safety simply to transport the individual from one place to another. Do you see that? Yes, I do, Your Honor. So that seems to be the exact opposite of what the legal standard is because isn't it the case that the legal standard isn't that there has to be a case that says the officer may do that, but rather there has to be a case that says the officer may not do that? And there is a case, you know, Florida v. Wells clearly says that, you know, it's a violation of your Fourth Amendment right. That's the, you know, Supreme Court of the United States that specifically says, back in 1990, that we hold that absent such a policy the instant search was not sufficiently regulated to satisfy the Fourth Amendment. That's Florida v. Wells, 495 U.S. 1. So the standard was already in place, but the defendants never raised this issue of qualified immunity at the time of summary judgment. They never talked about the events of 5-12-2016. So they never preserved that issue for this court to decide. If it wasn't addressed, why did the district court deal with it? The district court says right in there that it violated clearly established constitutional rights. That's qualified immunity language right there. Well, I would disagree only because of the fact that the defendants never raised qualified immunity in the 5-12-24, well, not even 24 hours, but the 10-4 period, not even 10-10-2 or 9-2. That period of time was never sought by the defendants who have qualified immunity. The court did it on its own. Su sponte assessed the qualified immunity, but the defendants never raised it, so therefore they didn't preserve that issue for this court to hear, and most of the times the defendants immediately appeal a quality immunity issue finding so that this court could decide whether that ruling was correct or not. They don't have to though, right? Just because they have a right to an interlocutory appeal doesn't mean that they have to do it then, right? I agree with you, but most defendants always move that way because that's the easiest arsenal in their toolbox to launch. They usually do because they like to give us the extra work, I think, right? Not the state or municipalities maybe, but the state is obviously represented by the Attorney General's Office, so therefore there is no insurance or anything like that that they would get more for carrying the case longer than it should be. Their interest is getting out as quickly as possible so that the defendants don't have to waste any more time on a case. So there is a difference there, but again, they never preserve the issue because they never, number one, filed in their brief in opposition to my partial summary judgment or in support of their motion for summary judgment. The brief never talks about 5-12-2016, and again, in their briefing, which you have to lock time in that mode, they never addressed qualified immunity in the summary judgment motion, the cross motions related to the events of 5-12-2016, when they clearly were aware of them because of the deposition testimony and plaintiff's statement of undisputed facts. So there was no way getting around that you didn't have knowledge of the events of 5-12, which plaintiffs were seeking relief on, which the court said, hey, if you're not going to answer why you did this, then clearly I am within my reasonable mind as a judge to be able to determine that there is no issue of fact here, and therefore the plaintiff is successful on a summary judgment motion. In connection with the verdict form related to the inconsistent verdict, that was the only argument raised by Defendant Nylon in connection with that jury verdict question. The problem with that is they, again, did not preserve that issue for this court to hear because they did not raise an objection right then and there when the jury came back and said we're fine for Nylon, and I hope you have the dash cam because the dash cam actually disputes what the trooper's testimony is. Again, we have no policy in place that talks about a search inventory or anything like that. And so clearly the jury disbelieved the defendants and believed the dash cam that Nylon went way beyond a reasonable base related to the inventory search, and it wasn't for inventory. In fact, Trooper Felsman actually stated that he believed it was criminal. Both Nylon and Felsman testified that the Pennsylvania State Police had a policy mandating that all towed vehicles were to be inventoried. Is that correct? Well, I would disagree with you because the dash cam shows that they did not. No, no, they testified that the Pennsylvania State Police had a policy mandating that all towed vehicles were to be inventoried. We're not talking about the dash cam for the moment. Okay. Isn't that right? Yes, but the dash cam refutes what their sworn testimony under oath stated because the dash cam gave the jury, and they did minute by minute. The dash cam showed what? Nylon going behind and actually going into the trunk, which wasn't any part of the three traffic tickets that were issued. And second, it showed how Nylon was much more of an aggressive vehicle. Was there anything taken in the inventory search? There was $800 in the car, what we testified to that, and then plus there was a cell phone. I thought the cell phone was given back to him, wasn't it? That was given back to him, but they should have inventory. They didn't do anything related to it. They said there was a search policy, but guess what? If there was a search policy, why didn't you put in the report? Because they don't even have a separate form to fill out. Why didn't you put in the form what was actually present, which in the trunk was like gym clothing. So that should have been put there. The money should have been put there. So clearly he had to pay for the impound lot, so it should be to get his car back, so there had to be money. And so therefore they didn't inventory that. They rummaged to try to find incriminating evidence. There were five troopers on this $3 traffic incident. It was a very different case than the ones you normally see where somebody is very uncooperative and says he just doesn't want to cooperate, only to the extent he absolutely has to. Are there any further questions of my colleagues? No, sir. No, thank you. All right. Thank you very much. We'll hear back from your opposing counsel. Thank you. Thank you, Your Honor, briefly. Could you start by addressing the argument that in lieu of pleading, so to speak, that there were admissions to the contention that this Yes. So the admission that counsel was referring to was, I think, the statement of undisputed facts, number 19. And in that statement, again, the language that was used was the same language upon the defendant, Feldman, handcuffed plaintiff, yet he had been released from jail. Now there was a citation embedded in that admission to Feldman's deposition testimony that talked about being handcuffed while leaving the magistrate's office. But in applying the summary judgment standard, essentially the court construed that admission in the light most favorable to the plaintiff, appellee, instead of construing that in favor of Corporal Feldman, who was the non-moving party at that point. Essentially they had no idea that that was essentially it said one thing and the citation said another, which when looking at that and applying the standard under summary judgment, at the very least it should have been construed in the light most favorable to Corporal Feldman and should have just been noted that upon leaving jail. As for the preservation issues with the jury instructions, I draw your attention to Appendix 0382, where counsel did object to the jury instructions. As for the other preservation issues at all times, counsel raised after the plaintiff's evidence, at the close of the plaintiff's case they made a Rule 50, at the close of all evidence made another Rule 50 motion, and then ultimately raised the issues post-trial with a Rule 50 and 59 motion. As for qualified immunity, Your Honor was correct that the qualified immunity standard that was applied was the exact opposite of what is required by the court, which was just recently reiterated in the James v. New Jersey State Police case, i.e. that the court essentially construed that there had to be a case essentially telling them that their conduct, finding that the conduct was lawful versus unlawful. With respect to something that the athlete counsel said, the judge did essentially do the analysis on qualified immunity sui sponte, and under Rule 56F, if the judge is going to make a sui sponte ruling, they need to provide for reasonable opportunity for the other side to be heard and to brief it. Had they done that, that would have cured a G issue in this case. As he also stated, with respect to the inventory search, it was testified to the fact that there was a policy. All the troopers testified to being familiar with the policy. The policy was outlined on the dash cam at 52 minutes to Apelli Watley, so he knew what was going to happen. He was asked to identify any valuables, if he would like to, so that they could be properly preserved. There was nothing located in the search. And overall, for the handcuffing for the courtesy ride, you're correct that it was a conditional offer. He had been unhandcuffed while he was in the magistrate's office, and then he was asked if he wanted to ride to the impound lot after the magistrate ordered Corporal Felsman to drive him there. Corporal Felsman explained to him what the condition was going to be, that he was going to have to be handcuffed for policy reasons and for officer safety. He then approached the vehicle, didn't say anything because he didn't speak through the entire situation, which makes this absolutely unusual for Corporal Felsman to deal with. He said it was one of the most unusual circumstances he's ever had to deal with. And, you know, based on that conduct, implicitly he believed that Apelli had consented to the transport, and based on other safety concerns, the unusual situation applying his common sense conclusions like the Supreme Court recently said is reasonable under the Glover case, and Apelli's background with a criminal conviction, which he was aware of for assault, it was reasonable for him to want to ensure that his safety was maintained while he's driving the vehicle. He can't, you know, control what happens behind him, so if he's going to give him a ride, he doesn't need to take a risk with his own situation and his own life. It's reasonable for him to continue with the status quo and maintain the restraints during that course. And there's no case, like you said, in fact, if you look at the case law from this within the circuit, not third circuit cases, but the district court cases, including Walter's case and the Weir's case, other jurists have found in various contexts that handcuffing an individual while giving them a courtesy transport doesn't violate clearly established law, especially when authorized by department policy. So with that, Your Honors, we ask that you reverse the lower court's decision and either enter judgment for Corporal Feldman and Corporal Nylon, or at the very least return it for consideration at summary judgment. Thank you, Your Honors. Thank you very much. Thank you to both counsels for being with us, and we'll take the matter under advisement.